The case will be taken under advisement. We'll call U.S. v. Moreno. Thank you. I'm glad you got caught. Ms. Christensen, welcome back. Thank you. I was here on Monday. It's good to be back. Seems like you're here every week. It's been a busy week. They've talked about getting me an apartment. May it please the court, counsel. My name is Joanna Christensen. I represent the appellant, Michael Moreno. The district court started the sentencing hearing on a faulty premise, that it could not consider pyrovalerone as a comparative drug to alpha-PVP. It cabined its consideration to methacathinone only because methacathinone is listed specifically in the guidelines, whereas pyrovalerone is not. However, pyrovalerone, and I hope I'm pronouncing these correctly, is a Schedule V substance, and no Schedule V substances are listed specifically in the guidelines. So starting with that premise, the district court misapplied the guidelines in really disregarding a substance that is chemically, structurally similar to alpha-PVP and has similar effects and similar usage by users. What the district court's decision does is essentially remove all Schedule V substances from possible comparators under the guidelines. And as we all know, Schedule V substances are the least punished under the guidelines. So that would take out the floor of some of these considerations in these designer drug cases. Is that really surprising, though, if something is scheduled as a Schedule I, which supposedly has all these harms and no medical uses and so on, that the commission might think, well, it's all right to disqualify all of Schedule V? I think to assume that, there would have to be more specific information in the application note about exclusion of Schedule V. If they had determined that Schedule V would never be considered, they would have left it out completely of the guidelines. Well, they can't do that, though, right? Because Schedule V is a list of controlled substances, and so it's punished under Title 21. They've got to have a guideline for Schedule V substances generally. Right. Okay. Except they do leave out quite a few substances. I mean, obviously, there are, I think, over 500 DEA Scheduled Substances, and the guidelines don't account for all of them, particularly these newer ones, that there has not been the usage rate, the danger rate analysis that the rest of the guidelines are based on. And I will make the point that marijuana is still a Scheduled Substance, and certainly the thought on how marijuana affects users has changed over the years. So I don't think it's necessarily such a Schedule-based consideration. If it were, the guidelines could say, just pick the most closely related Scheduled Substance to that one. So if it's in Schedule I, you pick a Schedule I substance. If it's in Schedule II, pick a Schedule II substance, and so on. The guidelines don't say that. Right. Under your theory, though, that phrase referenced in the guidelines, it really didn't have to be in there at all, then? I think, I'm unaware if there is a substance that is not Schedule V, and also not listed by name in the guidelines, but I think it would cover that situation if there were. So because not, obviously, not all unlisted substances are Schedule V, so there must be some unlisted that don't fall in Schedule V. So, and I also, I think that this also goes to the district court's real cabining of its consideration to methcaffeinone only, and really rejecting the rest, the other two factors. The chemical structure is one factor, and I think that's where it came in. The first is that the judge said, I'm not even going to consider it. But then we also consider the effects, which are primarily similar. They're all stimulants. They're all increased energy, some weight loss euphoria, but also paranoia, and they're all addictive. And then we also get to the potency. And while pyrovalerone is not as potent as LVPVP, that can be adjusted for in the guidelines, and you can adjust the guidelines accordingly. Ms. Christensen, I understand the textual debate here, I think, about what referenced in the guidelines means, and it doesn't look like that was really pressed very hard in front of the district judge. I think defense counsel acknowledged that the government might well be right on that issue, the textual issue. I guess my question is how much of a difference this wound up making to Judge Peterson, since he did consider pyrovalerone as a comparator and rejected it, because it was Schedule 5 and because the effects are so different from alpha PVP? I think that, I have two responses. One is, this is an area of law that's still developing. As you can see from our briefs, there's just not a lot of law. After Mr. Moreno's case was decided, two district courts have specifically disagreed with the court's interpretation of the guidelines. But not with the comparison, right? That is, I mean, in those cases- With the ultimate answer? With the ultimate conclusion, yes. That pyrovalerone is not really a comparable, a fairly comparable drug for alpha PVP. Right. Based on the other two factors, but the district court, to answer the second part of your question, said that most of the defense arguments were irrelevant, because pyrovalerone was not listed in the guidelines. I think that's a significant situation where it's not actually making that weighing and consideration. It's saying, well, yes, defense has raised this, but it's largely irrelevant because of the language of the guideline. It's not as a word listed in the guidelines. And as far as the use and dosage, effects and dosage, the government relies on the user's testimony quite a bit. And while I think that that can be helpful, particularly when we have a drug that's being used by people who use drugs, none of these users have used pyrovalerone or methcafenone before. They had been meth users, they had used synthetics, kind of vaguely referenced synthetics, the first generation of bath salts, methadrone, Adderall, Xanax, they had used all these substances while using alpha PVP. It's hard to talk about the effect of a drug when you're also using other drugs and you've never used the drugs that we're comparing it to. And that could very well be a problem in the guidelines, is that it just doesn't deal with these new drugs very well. Why was it unreasonable, though, for the district judge to say, look, I've heard the testimony from these users of alpha PVP, and this is a really awful drug, even more addictive than meth, which is hard to imagine for many of us. And that that's not just even remotely comparable in terms of effects to a Schedule 5 drug where we've got anti-diarrheals, epilepsy drugs, and cough syrup, right? I think it could be that almost any drug can be abused. So it's a potency and amount of use issue then. But the judge can take that into consideration, perhaps more in the 3553A factors, is that under the guidelines or under those factors, if it determines there are either no comparative substances, as some courts have determined, or there's more than one comparative substance, it can make a finding and then consider the other factors, the horrible nature of these drugs and the fact that they are changing constantly and being imported can be taken into account in the 3553A factors. I also do want to touch on treating the guidelines as mandatory. It's kind of part and parcel of the same argument, because we're saying not only the district court misapplied the guidelines, but also then treated the commentary as mandatory and said that it was constrained by the literal language of the commentary. In doing the guideline calculation, isn't that correct? You'd be here appealing if he departed from the... You are arguing that he departed, that he applied the commentary and the application notes incorrectly. Right. Right. I think, though, that his language is, once he had made that decision, is that he wasn't then allowed to adjust for the fact that methcathinone may not be the best comparator. It comes after he makes the decision about the guidelines that he felt that he was constrained by the language. I see that I'm in my rebuttal time, unless there are further questions, I'll reserve my time. All right. Thank you, Ms. Christiansen. Thank you. Welcome to another regular. Thank you so much. While I wasn't here last week, I will be here next Tuesday. Hopefully, as time goes on, this isn't my swan songs after 38 years, but the clock is ticking. Unfortunately, I looked up at many of my friends from over the years, and I'm like, well, I'm still here. I am still John Brodery, and I am still the United States Attorney as of today. I want to just start with the textual debate and just sort of set it in the correct context, I think, to, as much as anything, give some depth to what Judge Peterson did. And just keep your voice up. Oh, I'm sorry, yes. As I wrote in the brief, I raised it in my sentencing memo, and when we got to the court that day, I raised the same issue. I said, look, I don't know that you should be considering pyrovalerone because it is not referenced in the guideline. Trial Court Counsel, Mr. Moyers, as you point out, Judge Hamilton, said he was leaning towards the government's position. It could go either way. The government may very well be right. And that's sort of where we ended. There was never any discussion then about whether this one reference to the Schedule V in the application notes then just meant that every Schedule V was referenced. When you look at the guidelines, it lists lots of Schedule I's and the opiates and the cocaine and so on, Schedule II's. It does just kind of list generally Schedule III, IV, and V without really any detail at all, but that issue clearly was not presented at all to Judge Peterson. We simply went on under the presumption, the correct presumption, I believe, that pyrovalerone is not referenced in the guideline and we are going to limit ourselves to, the court should be limiting itself to those controlled substances. I think, however, again following what Judge Hamilton said, if that was there, if this court were to decide, frankly, on an issue that really hasn't been teed up that well, that when the guidelines say Schedule V, it means every Schedule V that exists and the judges should be looking at those. It is most certainly, was most certainly a harmless error by Judge Peterson. He specifically said in his written order, and it's in the appellant's appendix at page 23, just what you've alluded to, Judge Chang, look, it doesn't matter. If he could have used this as a comparator, he wasn't going to pick a Schedule V for all the reasons that we talked about in our briefing. Well, is it the government's position that a Schedule V controlled substance can never qualify as a comparator for unlisted substances Schedule IV or higher? That is actually, that's a very fair question and one that we certainly didn't address and haven't given tons of thought to. I would say the answer would be yes. We would state that for two reasons. First, I just don't think the guidelines, when they use the words referenced, would have meant to say these categories that are just listed by saying Schedule V or Schedule IV. First. Second, I think as Judge Peterson, and then more factually, as Judge Peterson said, and then was subsequently followed exactly the same by the judges in Emerson and Brewer, the district court judges in Vermont and Maine, this just is a non-starter. I mean, we're talking about weight loss drugs and stimulants of some level and I've done a fair number of these cases and I presented testimony to Judge Peterson in the Morrison Novak case, this case that this court just decided a month or so ago, the same sort of thing. What people are describing is nothing like those drugs. With Ms. Case and Ms. Schroeder, they were two users who had not, they weren't really cocktail users, all the drugs. Ms. Jaquino, who pleaded guilty, but I also presented, she did have a lot of things going on. There's no doubt about it. But as Judge Peterson noted, when it all came to the end for her, when she was hooked up with Mr. Moreno and Mr. Heidbreder, it was all awful PVP. But the other two users, Ms. Case and Ms. Schroeder, they had focused in and they were buying it directly from him, from Mr. Moreno. One, I can't remember which one, was actually his girlfriend for a while and they were using together. And the description on that third prong, on the potency prong, not on chemical structure but really more on potency and effects, their description was beyond anything that one could consider in Schedule 5. So I think in that sense, even if Pyrovalerone, even if Schedule 5s should be put into this matrix and the judges ought to look at all these, there is absolutely no way, and Judge Peterson made it very clear, that he would have selected them. Has the government proposed other controlled substances as the most closely related to alpha PVP other than methcathinone? I'm not aware of that being done in other cases. Right. With Dr. Willenberg and Dr. Prelow, they test by lots of different places. And of course, they're the ones who are telling me what we ought to be doing because I don't know the science. I'm pretty sure that with alpha PVP, we being DEA, have selected methcathinone as the referenced controlled substance. And they both were very open about it. They didn't consider Pyrovalerone. They weren't going to do it. It's not referenced. And they were very open with Judge Peterson about that. Would you agree that this is a kind of problem where the court really has to rely on the adversarial process? That is, if under either of these readings of the language referenced in the guidelines, either we're looking at 80 other drugs you have to look at or nearly 500 other drugs that have to be looked at. And the notion that the probation office or the court has an independent duty to explore all of those is just ludicrous under either scenario. So we've got to rely on either the government or the defense to bring forward a plausible comparison. Right. That's exactly correct, Judge Hamilton. I mean, Judge Peterson said, I can't believe I'm required to look at all the controlled substances that are growing every day. But what he really was saying is, how I think, how would he do that? We suggested methcathinone. The defense, as is being done in most of these cases, suggested Pyrovalerone. And that's what's teed up for the judge. His only real option was to do, I think, what he did, which is to listen to all the evidence that was presented. He certainly discounted these submissions by Mr. Moyers as ones that were somewhat irrelevant. But he tied that up in his written order by saying, look, even if I could have used that as the comparator, it's a non-starter. In terms of the, I will just briefly, on the mandatory, and I must admit I find this fascinating because, and I feel just, I think, one of your questions, had Judge Peterson, out of the blue, selected some other, he said, I'm going to compare this to methamphetamines listed, but some other non-reference controlled substance that was really bad for Mr. Moreno, we'd probably be down here confessing error. I mean, you can't make it up in the calculation phase. You can put all the guidelines aside. I tried Freddy Booker, so this has been with me a while. I'm to blame for a lot of problems here. You're the guy. When I was sitting there with Judge Shabazz, it all seemed so simple. But then you can put it all away. I understand that. But when you're calculating the guidelines, we're down here all the time, as is Ms. Christensen, talking about whether the judge did this right or did it absolutely carefully there, and I think they try very hard to do so, but it is, I don't know if ironic is the best word, but to be here and to be saying he tried too hard to follow the guidelines is odd to me. So I do think he did what was right. He followed them very, very carefully. He read them the way he read them. And then he clearly knew his discretion. I mean, he talked about Mr. Moreno's cancer and Mr. Moreno's family, but he just thought Mr. Moreno, with all these chances to stop, had brought a big problem to northwestern Wisconsin. Yeah, because his contact with law enforcement spanned the time during which Alpha PVP became a controlled substance. Exactly. Schedule I substance. He was first confronted with it in January of 2014. He admitted it. He said he was getting it from China. Things went along. The controlled delivery was right after it became scheduled. I got the case and chose to charge it because I've done those analog cases. I'm like, let's take it on after it's scheduled. But he was confronted many, many times, and Mr. Moreno just kept plugging away. Thank you very much. Thank you, counsel. Ms. Christensen, I think you have a minute left. I will start with the preservation of error. Well, I think defense counsel said, you know, listen, the government may be right about this because there's frankly not very much law. Defense counsel still did continue to push a Schedule V substance throughout the whole hearing. So I believe that that is enough to preserve the error. The government has proposed MDPV instead of methcathinone in two cases that I could find. One is United States versus Ramos. They're both on page 22 of our brief. So I don't know. I was not privy to those. I don't know why that decision was made. Perhaps there's been a switch. But, you know, I think that this question of whether you consider 80 drugs, you consider 500 drugs, that's exactly what the defense experts did for the district courts. I mean, that's why we have experts, is to assist the court in making this decision. And the chemists did that. They said, listen, we've considered all these substances, and we think this one is the most closely related. So the fear that the district court judge and the probation officer would have to go through these chemical structures, which I got to tell you is not fun for those of us who did not have chemistry since they were sophomores in college, they don't have to do that. And then I will just say about as I close, Mr. Moreno was given several chances. He was also addicted himself. So this was not a purely profit situation. He was addicted to this stuff and continued to order it well beyond being warned not to. All right. Thanks to both counsel. We'll take the case under advisement.